David and Karen BRANDRIET,
Plaintiffs and Appellees,

v.

NORWEST BANK SOUTH DAKOTA,
N.A., Defendant and Appellant.

No. 17728.

Supreme Court of South Dakota.

Argued Oct. 5, 1992.

Decided April 28, 1993.

William J. Janklow, Gary P. Thimsen, James E. Moore of Woods, Fuller, Shultz & Smith, Sioux Falls, for plaintiffs and appellees.

James C. Roby of Green, Schulz and Roby Watertown, for defendant and appellant.

HENDERSON, Justice.

## PROCEDURAL HISTORY/ISSUES

In September 1989, appellees David and Karen Brandriet (Brandriets), husband and wife, filed suit against Norwest Bank (South Dakota), N.A., (Norwest), Lenore Mueller, and Does I–X for rejection of the Brandriets' application for a Veterans Administration guaranteed home mortgage loan. The original complaint alleged fraudulent misrepresentation, negligent misrepresentation, and negligent processing of the application. The pleadings were later amended to include claims of intentional infliction of emotional distress and punitive damages.

Under SDCL 21–1–4.1, the Honorable Robert L. Timm, Circuit Judge, held a hearing on whether to permit the punitive damages claim on the emotional distress claim. He permitted the claim.

Shortly before trial, the appellees dismissed Mueller and Does I–X as named defendants.

On the first day of trial before Judge Timm, Mueller was called to the stand. During her testimony, she stated that her appointment calendar refreshed her memory. Because this document had not been produced during discovery, trial court granted a mistrial and awarded terms of $8,438.49 to the Brandriets.

Before the second trial, Judge Timm voluntarily removed himself from the case. It was then reassigned to the Honorable Eugene Martin, Circuit Judge. Trial began on September 23, 1991, and lasted for eight days. The jury returned a verdict finding Norwest not liable for intentional infliction of emotional distress; however, Norwest was held liable for negligent processing, fraudulent misrepresentation, and negligent misrepresentation. The Brandriets were awarded $41,453.22 in compensatory damages and $200,000 for punitive damages.

Norwest appeals, raising the following issues:

I. Did the trial court err by refusing to set aside the verdicts on negligent processing, fraudulent mis-

representation, and negligent misrepresentation? We hold that it did not.

II. Did the trial court abuse its discretion by excluding Norwest's evidence on causation and damages? We hold that it did not.

III. Did the trial court err in instructing the jury that a confidential relationship exists? We hold that it did not.

IV. Should the verdict for punitive damages be set aside? We hold that it should not.

## FACTS

In February 1987, the Brandriets were saddled with two home mortgages through the Watertown branch of Norwest in excess of $126,000 at 12.5% and 13.75% interest. When David Brandriet (Brandriet), a veteran of the Viet Nam war, learned that he could replace these loans with a single loan at 8.5% through the Veterans Administration (VA), he visited Val Neuberger, vice-president of business banking at Norwest, to learn the amount needed to pay off the two notes. After Brandriet told Neuberger he was going to apply at Western Bank in Sioux Falls for VA loan, Neuberger replied that Norwest was a "certified" VA lender and that Brandriet could obtain a VA loan through Norwest. Neuberger then set up an appointment with Lenore Mueller, Norwest's "certified" VA loan "expert."

After completing the first three pages of the Mortgage Loan Questionnaire concerning income, assets, and liabilities, David Brandriet took the form to Mueller on February 20, 1987, who then filled out the fourth page. Mueller informed Brandriet that the approval process would take thirty to sixty days. Three days later, Neuberger asked him to complete a disclosure statement. This form was completed and returned on the morning of February 26, 1987. Before noon that same day, Mueller told Brandriet that the VA had rejected the VA loan because of insufficient income and that he would soon receive a letter from the VA explaining the denial.

*In truth, the application had never been forwarded to the VA.* Mueller rejected the loan before she sent the application to the main office in Sioux Falls where Dan Callis, Norwest's underwriter, reviews applications.

Under the impression that the VA, rather than Norwest, had rejected the loan, the Brandriets did not bother applying for a VA loan elsewhere. In the meantime, the VA interest rate rose above 10%. Brandriet eventually tired of waiting for the VA letter and contacted the VA himself. He soon learned that the VA had never received the application.

Brandriet retaliated by meeting with Norwest officials six times to discuss the loan denial. At these meetings, he secretly recorded Mueller and Neuberger explaining such reasons as the VA made the denial, debt-income ratio cannot exceed 41%, and prior credit history was not considered. Norwest finally admitted that it had made the denial in December, 1987. Although the jury was not permitted to hear the recordings, the jury became aware of them through testimony of several witnesses.

Through deposition, Gene Seedorf of the VA testified about the loan process and what data was needed and how it was analyzed. VA loans are made through banks such as Norwest, and are guaranteed in part by the U.S. Government. These loans can be processed in either of two ways. Under the prior approval method, the financial institution gathers data and submits it to the VA for its decision. Under the automatic approval method, a VA lender gathers all pertinent data, analyzes it under VA guidelines, and decides, i.e., the loan should be approved.

Using conflicting data supplied by both parties, Seedorf could not assure the Brandriets that a loan would have been approved. However, he did not say they would be rejected, but that the VA would take a second look at the application if not approved initially by the bank.

After the Brandriets filed suit against Norwest, Myles Kennedy became the president of the Norwest branch. Kennedy per-

formed certain actions that brought about an intentional infliction of emotional distress claim which is not a subject of this appeal.

The jury returned a verdict finding Norwest not guilty of intentional infliction of emotional distress; however, Norwest was found liable for negligent processing, fraudulent misrepresentation, and negligent misrepresentation. Brandriets were awarded $41,453.22 in compensatory damages and $200,000 for punitive damages.

## DECISION

I. *The trial court did not err in denying the motion to set aside the verdicts on negligent processing, fraudulent misrepresentation, and negligent misrepresentation.*

Norwest claims that the evidence was insufficient to prove that Norwest fraudulently or negligently misrepresented facts to the Brandriets.

 When a party requests a motion for judgment notwithstanding the verdict, this Court has held that the trial court is required to base its decision on the jury's verdict, unless it finds that such verdict is inherently erroneous. Upon review, we will view the evidence in the light most favorable to the jury verdict and give the prevailing party the benefit of every inference and resolve in its favor every controverted fact. *Associated Press v. Heart of Black Hills Stations, Inc.*, 325 N.W.2d 49 (S.D.1982); *Ebert v. Fort Pierre Moose Lodge # 1813*, 312 N.W.2d 119 (S.D.1981).

 Fraud is a representation made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made. Further, that it was made with the intent to deceive and for the purpose of inducing the other party to act upon it. And, also, that the other party did in fact rely and act upon the false statement to his injury or damage. *Dahl v. Sittner*, 474 N.W.2d 897 (S.D.1991); *Holy Cross Parish v. Huether*, 308 N.W.2d 575 (S.D.1981).

 In resolving doubts in favor of the jury verdict, we need look no further than the actions and testimony of Norwest employees, Lenore Mueller and Val Neuberger. When Brandriet told Neuberger that he was going to Sioux Falls to apply for a VA mortgage, Neuberger falsely represented that Norwest was "certified" to handle VA loans right there in Watertown, and that the Norwest office in Sioux Falls had "certified" people to process the VA loan. In fact, no such certification by the VA exists. Norwest held both mortgages on the Brandriets' house. Neuberger deceived Brandriet to induce him to keep banking at Norwest.

When the Brandriets were rejected for the loan, Neuberger and Mueller, both knowing that Norwest was responsible, falsely claimed that the VA made the rejection. By placing the blame on the Veterans Administration, Neuberger attempted to avoid the embarrassment of inducing the Brandriets to apply at Norwest. During trial, his credibility was still in question as he was exposed by making several misstatements of fact while testifying.

Mueller, who testified that she was an expert in processing VA loans, negligently processed the Brandriets' application by estimating expenses, ignoring facts, and analyzing the bank credit report of a different Karen Brandriet. Mueller informed the Brandriets that the loan had been rejected by the VA when in truth she made the decision on her own before she forwarded the loan to Dan Callis at the Sioux Falls office.

Believing that the Veterans Administration had refused their application for a low-interest loan, the Brandriets kept their mortgages with Norwest. With the VA loan, their payments would have been about $800 *less* per month. Thus, the Brandriets had relied on Norwest to their detriment.

Attempting to avoid further blame, bank employees testified that Norwest used a prior approval system meaning that Norwest could reject the loan without submitting it to the VA. Yet, the loan application completed by the Brandriets states that the

"[l]oan must go to VA for prior approval." Furthermore, Norwest acknowledges the potential loss, but claims that the Brandriets did not prove that the VA would have approved the loan.

Dan Callis testified that he serves as an "advocate" for customers and tries to find ways to get their loans approved. After reviewing the Brandriets' expenses and finances, Gene Seedorf, a loan assistant for the VA, testified that a bank (not the VA) reasonably could have rejected the loan. However, he testified that the VA also seeks to approve loans. In the worst-case scenario, someone higher up would have to make the decision. Neither Callis nor Seedorf testified that the Brandriets' loan should have been rejected.

Thus, the jury was left with the duty to determine the success of the application. In light of the facts, we do not find the verdicts on negligent processing, fraudulent misrepresentation, and negligent misrepresentation to be inherently erroneous, and affirm the award for compensatory damages.

II. *The trial court did not abuse its discretion by excluding evidence concerning the Brandriets' credit history.*

■ The trial court granted the Brandriets' motion in limine prohibiting evidence of their credit and financial history prior to 1987. Norwest contends that this was an abuse of discretion because such evidence is highly probative and material to its defense. Furthermore, Norwest claims this evidence is necessary to defend its intent and motives for denying the loan with respect to the claims for fraud and punitive damages.

"The trial court's evidentiary rulings are presumed correct and will not be reversed unless there is a clear abuse of discretion." *Marnette v. Morgan,* 485 N.W.2d 595 (S.D. 1992).

Offhand, past credit history would certainly seem relevant when contemplating the loaning of more money to a customer. However, Norwest was not seeking to produce evidence that Brandriets had a bad credit rating or had defaulted on a loan. Testimony disclosed the Brandriets pay their debts but prior to 1987 they incurred some outstanding debts placing them in a troubled financial state. If that information had been presented, Norwest contends, the jury would have known Norwest's motives for refusing the loan.

This argument lacks merit because the jury did hear evidence concerning the Brandriets' heavy debt-load at the time of application. On numerous occasions, Neuberger, Mueller, and Callis testified that the Brandriets were rejected based on their *current* debt-to-income ratio or insufficient income. We view their credit history, prior to 1987, as not being a relevant factor.

Norwest further claims that had the application traveled further through the process, the credit history would have been relevant to the VA and resulted in rejection. Norwest does not claim that the Brandriets' application was incomplete.

Upon review of an alleged abuse of discretion, we consider if a judicial mind, in view of the law and the circumstances surrounding the case, could have reached such a conclusion. *Linard v. Hershey,* 489 N.W.2d 599 (S.D.1992). Because neither the completed application nor Norwest required the credit history, we find that the trial court did not abuse its discretion in prohibiting the evidence.

III. *The trial court did not err in instructing the jury that a confidential relationship exists.*

■ Although this Court has found confidential relationships in such areas as attorney and client, vendor and vendee, trustee and beneficiary, we have never specifically recognized or denied the existence of a confidential relationship between a bank and a borrower. However, such a relationship is not restricted to any particular association of persons. It exists whenever there is trust and confidence, regardless of its origin. *Hyde v. Hyde,* 78 S.D. 176, 186, 99 N.W.2d 788, 793 (1959).

■ The Brandriets continued their business relationship with Norwest because of

Neuberger's recommendation. Neuberger represented Mueller to Mr. Brandriet as someone who was a "certified" processor of VA loans. Despite this blatant misrepresentation, Neuberger testified that the bank owed a duty to the Brandriets. Under oath, Mueller stated that she was an expert on VA loans, the Brandriets had relied on that expertise, and she was working for the Brandriets. Additionally, Callis stated that the bank works in an advocacy role whereby it finds a way to obtain a loan approval.

Brandriets placed their trust and confidence in Norwest to process the VA loan; Norwest officials were supposed to be acting with the Brandriets' interest in mind. Where such an exchange of trust and action exists, a confidential relation also exists. *Schwartzle v. Dale*, 74 S.D. 467, 471, 54 N.W.2d 361, 363 (1952).

In some instances, a "relation is said to be confidential as a matter of law." *Hyde*, 99 N.W.2d at 793. The trial judge heard the testimony of the bank personnel and properly ruled that the Brandriets and Norwest had developed a confidential relationship, by virtue of these facts and circumstances, and as dictated by precedent. We hold that the trial court did not err in this finding.

IV. *The punitive damages award shall stand.*

At the close of evidence, Brandriets moved to amend the complaint to request punitive damages for fraudulent misrepresentation. As the pleadings already demanded punitive damages concerning the emotional distress claim, and as the issue of fraud was pled and tried, Brandriets maintain that, pursuant to SDCL 15-6-15(b), the issue of punitive damages for fraud was tried by express or implied consent of the parties. We agree.

Although the decision to allow an amendment to the pleadings is within the discretion of the trial court, the test for allowing an amendment is whether Norwest had a fair opportunity to litigate the issue, and could Norwest have offered any additional evidence had the case been tried

with the punitive damage claim in mind. *Beyer v. Cordell*, 420 N.W.2d 767, 769 (S.D.1988); *Bucher v. Staley*, 297 N.W.2d 802, 806 (S.D.1980). When exemplary or punitive damages are involved, the test for amending the pleadings involves another step. SDCL 21-1-4.1 provides:

> In any claim alleging punitive or exemplary damages, before any discovery relating thereto may be commenced and before any such claim may be submitted to the finder of fact, the court shall find, after a hearing and based upon clear and convincing evidence, that there is a reasonable basis to believe that there has been willful, wanton or malicious conduct on the part of the party claimed against.

In the normal course of events, a pretrial hearing would have been held on the issue of punitive damages. However, SDCL 21-1-4.1 does not require a *pretrial* hearing, nor was Norwest expecting one. According to the May 3, 1991 Motions Hearing, counsel for Norwest suggested waiting until after the evidence was presented at trial before determining the admissibility of the punitive damages on the emotional distress claim. It is undisputed that such a hearing was held, albeit punitive damages for emotional distress.

Brandriets proposed that they be allowed to amend their pleadings to conform to the evidence. Previously holding that the Brandriets proved their claim of fraud, we hold that the judge's finding that "there is a reasonable basis to believe that there has been willful, wanton or malicious conduct" comports with the jury's determination that Norwest's conduct was "willful, wanton or malicious." *See* SDCL 21-1-4.1. Thus, Norwest had a fair opportunity to try its case under the "willful, wanton or malicious" standard and had notice that Brandriets were seeking punitive damages. Under *Vreugdenhil v. First Bank of S.D.*, 467 N.W.2d 756 (S.D.1991), Brandriet was only required to establish a prima facie case on punitive damages. Mission accomplished.

With the elements of fraud and SDCL 21-1-4.1 overlapping, Norwest cannot be said to have been prejudiced or caught unaware by the punitive damages claim for

fraud, especially when Norwest was already facing the other punitive damages claim. "[T]o recover on a punitive damages claim ... a plaintiff must still demonstrate by a preponderance of the evidence that he or she is entitled to punitive damages." *Dahl* at 902.

Our holding does not erode *Dahl* or *Vreugdenhil;* instead it stands alone because the elements and intent of SDCL 21–1–4.1 were clearly met by the parties. Finding that the Brandriets and the trial court have fulfilled their respective burdens, we affirm the exemplary damages award.

Affirmed.

MILLER, C.J., concurs.

WUEST, J., concurs specially.

SABERS, J., dissents in part and concurs in result in part.

AMUNDSON, J., dissents.

WUEST, Justice, concurring Specially.

I concur with the majority but write specially to address the issue of punitive damages.

SDCL 21–1–4.1 provides:

In any claim alleging punitive or exemplary damages, *before any discovery* relating thereto may be commenced and *before any such claim may be submitted to the finder of fact,* the court shall find, after a hearing and based upon clear and convincing evidence, that there is a reasonable basis to believe that there has been willful, wanton or malicious conduct on the part of the party claimed against [emphasis added].

The statute imposes two conditions; a hearing must be held:

(1) Before discovery may be granted.

(2) Before any such claim may be submitted to the finder of fact.

The requirements under SDCL 21–1–4.1 were met. Discovery had already been granted on the punitive damage claim, albeit on the Brandriet's claim under a different cause of action for emotional distress.[1] The required hearing was held before submission of the issue to the jury; any delay was at the request of Norwest. Therefore, both statutory conditions were met.

SDCL 21–1–4.1 was enacted to prevent the harassment of defendants by compelling production of income tax records, net worth statements, and other financial information by insuring the claimant has a reasonable basis for the punitive damage claim. *Dahl v. Sittner,* 474 N.W.2d 897, 901–02 (S.D.1991) (citing Robert E. Driscoll, *Statutory Restrictions on the Discovery and Trial of Punitive and Exemplary Damage Claims in South Dakota,* 33 S.D.L.Rev. 247, 251 (1988)). Since there was a hearing, the purpose of the statute was satisfied.

SABERS, Justice (dissenting in part and concurring in result in part).

I believe the trial court erred on Issue II in excluding evidence of Brandriets' credit history. Their credit history is relevant, highly probative and material to Norwest's defense. SDCL 19–12–2. Very simply, Brandriets' credit history alone would be sufficient reason for denying this loan. This credit history was also extremely important in view of the substance of Justice Amundson's dissent.

The majority's view of this matter is simply too narrow. It is one thing for the jury to *hear* "on numerous occasions, Neuberger, Mueller, and Callis testif[y] that the Brandriets were rejected based on their *current* debt-to-income ratio or insufficient income." It is another thing for the jury to be *convinced.* Their credit history may have been the key in proving that denial of the loan was proper and the jury was entitled to have this information in order to make its decision. I would reverse and remand for trial on this issue.

I write specially to concur in result on Issue IV—punitive damages. It appears that the burden to demand a predeposition or pretrial hearing on punitive damages should be upon the defendant under SDCL 21–1–4.1. *See generally Dahl v. Sittner,* 474 N.W.2d 897 (S.D.1991); *Vreugdenhil v.*

---

1. The jury found in favor of the bank on the emotional distress claim.

*First Bank of S.D.*, 467 N.W.2d 756 (S.D. 1991). Since that is the result of this opinion, I concur in that result.

AMUNDSON, Justice (dissenting).

Brandriets alleged in their amended complaint that but for the mishandling of their VA loan application by Norwest, the loan would have been approved. Therefore, the genesis of their claim is that they were qualified for the VA loan. If not qualified, they could not have suffered any damages no matter how ineptly the application was processed by Norwest.

Brandriets' pleading advised Norwest that they were qualified to receive the VA loan. Since they alleged this fact, they had to present evidence to prove it. *Gross v. Gross*, 355 N.W.2d 4, 8 (S.D.1984).

> Not only is it essential that every fact necessary to constitute a cause of action or defense be pleaded ... but every such fact, if put in issue, must be proved. Pleadings do not prove themselves, that is, their allegations do not constitute evidence of the facts alleged in favor of the pleader, and averments of a pleading unsupported by proof are unavailing. Thus, as a general rule, every material allegation of a complaint, declaration, or petition must be proved unless admitted or deemed admitted by the adverse party[.]

71 C.J.S. *Pleading* § 520 (1951).

It is obvious from the record of this case Norwest did not admit that Brandriets were qualified for the VA loan. In fact, the closing argument of counsel for Norwest was to the effect that Brandriets had not proven by a preponderance of the evidence that they qualified for the VA loan. In the rebuttal argument of counsel for Brandriets, the following is a portion of same:

> Ladies and gentlemen, there is one thing I submit. Read all the instructions, and if you find one instruction that says that

we have to absolutely— ... we have to absolutely prove that we would have gotten the loan. If you find an instruction from the judge that says we have to prove that they would have gotten the loan, you rule for the bank.

This is an accurate statement since a review of the court's instructions reveals that there is no mention of Brandriets having to prove that they absolutely would, possibly could or even might, qualify for the VA loan. This is incredulous when considering the pleadings. Also, after the verdict was rendered, Norwest filed a motion for judgment n.o.v. At the conclusion of the hearing on this motion, the judge stated that whether the VA would or would not have approved the loan was a jury question and the jury decided the loan would have been approved. How can this be if the jury was never instructed that one of the elements to be proven by Brandriets in their cause of action was their qualification for the VA loan.

When there is competent evidence on any issue in a case, the trial court has to instruct the jury accordingly and failure to so instruct constitutes prejudicial error. *Kreager v. Blomstrom Oil Co.*, 379 N.W.2d 307, 309 (S.D.1985). Even though the court and counsel for Brandriets agreed a jury question existed on whether or not Brandriets qualified for the VA loan, the jury was never instructed that before they were to go to the claims of fraudulent misrepresentation, negligent misrepresentation or negligent procedure, they had to determine the threshold issue of qualification.* The failure to so instruct has prejudiced Norwest in this case. Therefore, I *would* reverse and remand for a new trial so that a complete and accurate set of jury instructions would be given.

---

* A review of Seedorf's expert testimony certainly does not provide a clearcut answer as to Brandriets' qualifications for the loan. Depending on what figures the expert relies on, his answer on qualifications vascilates. Therefore, the trial

court would need to give the jury instructions on how to resolve the issue of qualification for the VA loan based on appropriate standards employed in processing the loan.